Middle District of Florida

Case No. <u>6:06-bk-02959-ABB</u>
Chapter 7

Jack F. Durie, Jr.
Objector/Complainant

v.                    Adv. Pro. No: 6:07-bk-00076-ABB

Heather Ann Dueease
Debtor
Last four SS 6892

**DURIE'S RESPONSE TO DEBTOR'S CLAIMS AT HEARING ON 25 FEBRUARY 2008 CONCERNING CALLS TO HER VOICE MAIL, MOTION FOR SANCTIONS, AND MOTION FOR REHEARING/RECONSIDERATION OF COURT'S RULING DISMISSING DURIE'S ADVESARY COMPLAINT**

Jack F. Durie, Jr. responds to the debtor's claims that he not only had inappropriate contacts with her, but that he was abusive and threatening to her, "and just loud voice and yelling", to the extent that she cried and felt that she had to file a police report, and Durie also moves for sanctions, and for the court to reconsider its dismissal of his adversary complaint and allow him to proceed, and says:

DURIE'S RESPONSE TO DEBTOR'S CLAIMS OF INAPPROPRIATE
CONTACTS IN HER MOTION FOR SANCTIONS

1. The Debtor filed a motion seeking sanctions based on claims of inappropriate and abusive contacts with the debtor. ("loud voice and yelling", see page 6 of attached transcript)

2. At a hearing held on 25 February 2008, said motion was considered, during which time the debtor took the stand and made a number of clearly false statements, consisting of perjury.

3. The magnitude of the debtor's dishonesty was clearly demonstrated by a CD produced by her lawyer to Durie, where the alleged inappropriate and abusive calls to the debtor were recorded.

4. At the hearing, knowing that he had not made calls as described by the debtor ("loud voice and yelling"), Durie asked that the recordings be produced, assuming that if the debtor was accurate she would insure that she had the recordings with her. She claimed that she did not have the recordings with her.

5. After she got off the stand she admitted that she had the recordings with her and attempted to play them, but they were not clear. The attorney for the debtor volunteered to produce a copy of the recordings for the court and for Durie, which he did.

6. There is a monumental difference between the claims of the debtor on the stand, under oath (and her lawyer in his motion), in characterizing Durie's contacts with her voice mail ("loud voice and yelling") and the CD recording of the actual calls.

7. Several things must first be considered or recognized. First, Durie had filed an adversary complaint, and the court had entered an order compelling the debtor to respond to discovery by an early date in November 2007.

8. In Durie's opinion the debtor was representing herself based on the return of Pleadings, as undeliverable, from her attorney of record in the bankruptcy proceedings, as well as information obtained from the secretary at the phone number of her former attorney.

9. Further, after obviously receiving the order compelling the debtor to respond, the debtor contacted Durie (which she admitted at the hearing), giving him the impression that she wanted to work something out. This contact was not admitted to by the attorney for the Debtor when he sought sanctions for Durie's subsequent attempted contacts with the Debtor.

10. As noted above, there is a monumental difference between the testimony of the debtor (and her lawyer) and Durie. Had the recording not been produced Durie would have been subject to sanctions had the debtor's flagrant lies been believed.

11. Based on the recordings it is clear first that the attempted contacts by Durie followed debtor's contacts with Durie, and related directly to her contact with Durie as well as his adversary complaint.

12. Compare her claim on page 6. where she stated that she picked up the phone on a claimed call from Durie, and told him to please stop, with her testimony on pages 11. and page 12., where she admitted that she had initiated the first call. (I.e, meaning that she had not picked up the phone, and that she did not tell Durie to stop, as she controlled that conversation)

13. As to her call to Durie, she testified that she asked Durie why Durie was doing this. She said nothing about any abuse and telling Durie to stop.

14. In listening to the messages left by Durie, it is clear that Durie was not threatening, and "loud voice and yelling" (again see page 6.) or otherwise abusive in any way whatsoever, as claimed by the debtor.

15. During the first two calls Durie simply made inquiry, in a conversational tone, as to what the debtor proposed, obviously in response to her suggested effort to settle.

16. During the third call Durie advised of his desire to schedule her deposition.

17. During the first call Durie identified himself as her "bosom" buddy, an intended term of endearment, and in the second call Durie said, "God Bless You".

18. It is clear that Durie's tone of voice was always conversational, and that the subject of the first two calls was in obvious response to the debtor's call to Durie, and the third call was strictly within the context of the then pending complaint against the debtor.

## MOTION FOR SANCTIONS AGAINST BOTH THE ATTORNEY FOR THE DEBTOR AND THE DEBTOR

Durie moves for sanctions against both the debtor and her attorney, and says:

19. Both the attorney for the debtor and the debtor misled the court.

3

20. In his motion for sanctions the attorney for the debtor did not advise or remind the court that Durie had an existing adversary complaint against the debtor, and also did not advise the court that Durie's contacts with his client followed her contact with Durie, apparently following receipt of the court's order compelling discovery.

21. The debtor, from the stand, did not advise of the fact that she had first contacted Durie, and further, she misrepresented the nature of Durie's contact, trying to prejudice the court claiming that Durie was abusive by yelling and in a loud voice, and by initially claiming that she did not have the recording. (leaving Durie defenseless until Durie asked for it,and received it, knowing that she had misrepresented the contacts)

## DURIE'S MOTION FOR RECONSIDERATION OF THE COURT'S RULING DISMISSING HIS COMPLAINT

22. Claimants were originally instructed to not file proof of claims, presumably because the debtor took a position that there were no assets.

23. In a notice served March 16, 2007 the trustee advised that she had recovered assets, further advising that claims could be filed on or before June 18, 2007.

24. Durie believes that the debtor is not honest, as Durie was never paid by the debtor, she did not identify her assets available to her the creditors, and she committed perjury on the stand during the hearing.

25. Durie then targeted the cutoff date for the filing of claims for his filing of an adversary complaint, which he filed the day after he filed his proof of claim, relating the two.

26. It appears that a motion may be made to file an adversary complaint late, which Durie did.

27. Because of the apparent misinformation provided by the debtor to the trustee to the effect that there were no assets, and in fact there were, resulting in an extension of time to file claims, Durie believes that he should have been permitted to file a late adversary complaint. There can not be any prejudice.

Wherefore, for the reasons set forth herein, the objector/complainant, Jack F. Durie, Jr., moves that the court deny the debtor's Motion for sanctions, grant his

motion for sanctions for filling a misleading motion, and for the offer of misleading testimony, and further objects to the debtor's bankruptcy as to him, and moves that the court enter an order in favor of Durie, following a necessary/required evidentiary hearing, if necessary.

I certify that a copy of the foregoing, with the transcript of the subject hearing on the 25th of February 2008, attached, has been hand delivered to the court on Thursday 13 March, 2008, and mailed to the attorney for the debtor, Stephen R. Caplan, on the same date.

Jack F. Durie, Jr.
2900 Lake Shore Drive
Orlando, Florida 32803-1121

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 06-02959-6B7
ADV. NO.: 07-00076

IN RE:

       HEATHER ANN DUEEASE,

               Debtor.

---

FEBRUARY 25, 2008

EXCERPT TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ARTHUR B. BRISKMAN
UNITED STATES BANKRUPTCY COURT

A P P E A R A N C E S:

STEPHEN R. CAPLAN, ESQUIRE
     Appearing on behalf of the Debtor/Defendant

JACK DURIE, JR., ESQUIRE
     Appearing on behalf of the Plaintiff

REPORTED BY:
Cynthia D. Vachon
Accredited Court Reporters

I N D E X

TESTIMONY OF HEATHER ANN DUEEASE:

    Direct Examination by Mr. Caplan     3
    Cross Examination by Mr. Durie     8

CERTIFICATE OF REPORTER:     17

PROCEEDINGS

\*   \*   \*   \*   \*

THE COURT:  Why don't you put some testimony on.

MR. CAPLAN:  Okay.

THE COURT:  I think it's going to be contested.

MR. CAPLAN:  Would you like her to take the stand?

THE COURT:  Yes, please.

THE CLERK:  Please come forward to be sworn. Please raise your right hand.

THEREUPON:

HEATHER ANN DUEEASE

having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please state your full name and address for the record.

THE WITNESS:  Heather Ann Dueease.

THE CLERK:  And your address?

THE WITNESS:  424 East Central, Number 246, Orlando, Florida, 32801.

THE CLERK:  Thank you.  You may take the stand.

DIRECT EXAMINATION

BY MR. CAPLAN:

Q    Ms. Dueease, did you file a Chapter 7

1   bankruptcy November 6th of 2006?

2        A    Correct, yes.

3        Q    And when you filed that bankruptcy, did you owe

4   a debt to Mr. Jack Durie?

5        A    Yes.

6        Q    Was Mr. Durie listed as a creditor in your

7   bankruptcy filing?

8        A    Yes.

9        Q    What was the origin of the debt owed to Mr.

10  Durie?

11       A    I was a tenant, commercial tenant in his

12  building on 1000 East Robinson.

13       Q    Okay.  Was the debt, the basis of the debt then

14  rent?

15       A    Yes.  Commercial rent.

16       Q    Okay.  And when you filed the bankruptcy were

17  you represented by Doug Neway?

18       A    Correct, Douglas E. Neway.

19       Q    Okay.  And did there come a time after the

20  filing of your bankruptcy that you were directly

21  contacted by Mr. Durie?

22       A    After -- did you say after the bankruptcy?

23       Q    After the bankruptcy was filed.

24       A    It was before and after but, yes, after,

25  correct.

1       Q     Okay.  After the filing of the bankruptcy, how

2  were you contacted by Mr. Durie?

3       A     By phone.

4       Q     Telephone?

5       A     Um-hum, correct.

6       Q     And, do you remember when that would have been?

7       A     Well, the most previous ones were back in

8  November.  I have the dates written down.  It was about

9  three times in November of 2007, a few months ago.

10      Q     Okay.

11      A     There was a previous time before that but it

12  was in the middle of the filings, but this was the second

13  time.

14      Q     Okay.

15      A     And I did file it with the police.

16      Q     Okay.  When Mr. Durie contacted you by

17  telephone, do you recall whether or not he was attempting

18  to collect the money that he claimed you owed him?

19      A     Correct, that was the intention of the call.

20      Q     Okay.  Do you recall what he said to you?

21      A     Not what I would call exact terms but I have

22  them recorded.

23           One time we actually talked and the other times

24  were voice mails, long voice mails that he left, and the

25  intention was to collect.  Really the intention was to

*[handwritten:] One recorded the call!*

*NO!* *NO!* *alone!* *NO!*

1    scare the hell out of me. It just -- it just made me
2    nervous, and he was making a lot of accusations, and
3    there was a lot of threatening and just loud voice and
4    yelling. And so I started crying on the line and stopped
5    and hung up, and the other two were long voice mails that
6    I recorded and gave to you my attorney.

7         Q    Okay. And you said that you actually talked to
8    him on one of the phone calls?

*NO!*

9         A    Yes, correct. I picked up the phone.

10        Q    And the other two were voice mails?

11        A    Correct.

12        Q    And you say he scared you. How did he scare
13   you? What did he say that scared you?

14        A    Told me I was a thief. Told me that I -- I
15   don't deserve this, it's going to open an entire case.
16   He's going to make my life hell. He's going to try to
17   drag me through this. He just started going on and on
18   and on and on.    *NO!*

19             I'm not an attorney. I don't understand those
20   languages. It upset me and kind -- really made me
21   nervous and I told him to please stop. I apologized I
22   owed him money. He was of many creditors I owed money
23   to. I apologized. It was -- bankruptcy was difficult
24   for me, and I don't like owing money but it just
25   happened.

*★ No such statement! ★*

1        So it just made me really nervous and scared
2    me; and so because of that, I filed the police for that
3    and then I also contacted his parole officer.
4        Q       His what?
5        A       Parole officer.
6        Q       Parole officer?
7        A       (Witness nods head.)
8        Q       You said you contacted the police?
9        A       I contacted the police just in filing a threat,
10    just to file it, and that was the second time that I
11    filed one.  The third one was early 2007, maybe late
12    2006, when the proceedings started.
13        Q       Okay.  Around the time you filed the
14    bankruptcy?
15        A       Yeah, when I first filed is when it first
16    happened, and then the second one was in November 2007.
17        Q       Okay.  And in November of 2007, after you were
18    contacted by him, did you contact my office?
19        A       Yes, I contacted your office and --
20            MR. DURIE:  Your Honor, I allowed a lot of
21        leeway but I object to leading.
22            THE COURT:  Overruled.  Continue.
23            THE WITNESS:  Yes, I contacted your office and
24        I -- the recordings I did have I sent over via MP3
25        player.  And then I did contact his parole officer

*No threat!* (handwritten annotation)

1      and was -- I asked what to do and he said, well, you

2      know, consider just filing it to file it.  So I did.

3  BY MR. CAPLAN:

4      Q    Okay.

5      A    With the Orange County Police Department here

6  locally.

7      Q    Have you heard from him directly since you

8  contacted my office?

9      A    No, I have not.  Just those three times, that

10  was it.

11     Q    When he left the voice mails, what did he say

12  in the voice mails?

13     A    Again pretty much the same thing, that he's

14  going to reopen my case, he's going to make all the

15  creditors pay (sic) me, he thinks I'm a thief and that I

16  deserve to have to pay everything, that he thinks I'm a

17  liar, that all of this is a big lie.

18          I understand he's upset.  There's a lot of

19  other people that I owed and I -- my business went under.

20  I didn't make the right decisions in my business --

21     Q    Okay.

22     A    -- and he said -- that's what he said.

23     Q    Okay.  Thank you.

24          MR. CAPLAN:  No other questions.

25          THE COURT:  Any questions of this witness?

```
 1              MR. DURIE:  Oh, yes.
 2                       CROSS EXAMINATION
 3    BY MR. DURIE:
 4         Q    Now you gave an address, an Orlando address and
 5    you just told us sitting here you don't live in Orlando;
 6    is that correct?
 7         A    I --
 8         Q    Yes or no?
 9              THE COURT:  Sir.  I don't know, are you an
10    attorney?
11              MR. DURIE:  Yes.
12              THE COURT:  Then have a little respect.
13              MR. DURIE:  I do.
14              THE COURT:  Excuse me?
15              MR. DURIE:  I do.
16              THE COURT:  No, you don't.
17              MR. DURIE:  There's no problem saying yes or
18    no.
19              THE COURT:  Sir, a little respect.
20    BY MR. DURIE:
21         Q    Can you give me a yes or no answer please?
22         A    My address is here in Orlando, the 246 (sic)
23    East Central, Orlando one I just gave to the Court.
24         Q    Okay.  Did you receive my complaint at that
25    address after your lawyer left town?
```

1    A    I left -- I don't know what complaint -- which
2    complaint you're talking about.

3    Q    Any complaints.

4    A    There's -- the things that I have received in
5    the mail there's this -- I don't know the names of which
6    complaint it was.  You did send someone to the 218 East
7    Concord address that I never received because that
8    address was on the bankruptcy as well, the 218 East
9    Concord.  But I have received some -- the documents just
10   received.  The complaint I can't say yes or no.  I don't
11   know.

12   Q    Was there a point in time that your former
13   lawyer didn't represent you anymore?

14   A    No.  He -- after the bankruptcy was complete
15   and after the bankruptcy was complete was when Mr. Neway
16   became trustee.

17   Q    Did he move to Jacksonville at some point?

18   A    I think so.

19   Q    Did you receive papers from me serving you
20   because he had moved?

21   A    Did I receive papers from you because he moved?
22   No.  Did I receive papers from you --

23   Q    Same papers I sent to him.

24   A    No, I don't think so.  That's where the
25   confusion came up because Mr. Neway left and then when I

1   did receive some order -- an order I think from the

2   Court, that is when I contacted -- that's when I tried to

3   contact Mr. Neway and found out of his move to

4   Jacksonville and becoming trustee and found out that Mr.

5   Caplan had worked out a situation with Mr. Neway and he

6   had some of the filings and that's how I got Mr. Caplan.

7        Q    Okay.  And I have a copy of that order in front

8   of me, and we had a hearing on the 5th of November which

9   was close in time to these so-called phone calls to you.

10       A    Correct.

11       Q    And you were ordered to respond or comply with

12  discovery within fourteen days?

13       A    Correct.  That is when -- when I received that

14  order, that's when I had contacted a lawyer and got a

15  lawyer involved.

16       Q    You agree that you called me?

17       A    Did I call you?

18       Q    Yes.

19       A    To figure out what's going on?  I did call you.

20       Q    I'm sorry?

21       A    I called you once, yes.

22       Q    Okay.  And then the phone calls from me to you

23  were because you were supposedly representing yourself

24  and were --

25       A    No, I never represented myself --

```
 1        Q    Okay.

 2        A    -- no, never.

 3        Q    Okay.  Sorry.

 4        A    I will not represent myself.  I'm not a lawyer.

 5        Q    Okay.

 6        A    I don't want to be --

 7        Q    Okay.  Okay.  But in any case, the calls that I

 8   made to you were after you called me?

 9        A    Yes, they were after I called you once.

10        Q    Okay.  So you initiated the first call?

11        A    I did initiate the first call.

12        Q    And you said something like, why are you

13   picking on me?

14        A    Why are you doing this.

15        Q    Something like, why are you picking on me, this

16   poor thirty-two year old gal, something like that.  Do

17   you agree?

18        A    No.  I just asked you, why are you doing this?

19   I don't understand, the bankruptcy is complete, and I

20   apologized to you that I did owe you money along with

21   many other creditors and I apologized.  I made some bad

22   decisions in my business, I'm sorry.

23        Q    Okay.  And did you say that you didn't want to

24   have to -- you did not want to have to spend money on a

25   lawyer?
```

1          A    I would rather not, no, but --

2          Q    Okay.  So did you imply that you wanted to talk

3     about possibly settling a case, a lawsuit I filed?

4          A    No, because I'm not allowed to give you money

5     as a creditor under the bankruptcy law.  That would be

6     illegal.

7          Q    No -- excuse me.

8          A    Well, what I understand -- I'm not a lawyer but

9     that's what I understand.  If I could give money --

10    everybody money back I would.  I made some bad decisions

11    in my business and I filed bankruptcy on my business.

12         Q    My point is, if in fact there's a lawsuit

13    pending and it could be settled, you can settle something

14    like that, can't you?

15         A    No.

16              MR. CAPLAN:  Objection as to relevance, Your

17         Honor.  I don't know what this has to do with the

18         motion for sanctions.

19              THE COURT:  Let's move on.

20    BY MR. DURIE:

21         Q    Do you have that recording now?  Can we have it

22    so we can play it for the Court to see how valid your

23    complaints are about my yelling and raising my voice and

24    complaints?

25              THE WITNESS:  Do you have it?  No?  Okay.

```
1        BY MR. DURIE:

2             Q     What?

3             A     I sent them in electronic file MP3 to my

4        attorney.

5             Q     I would like to have it played before the Court

6        because when I testify I'm going to disagree with your

7        characterization of how I communicated.

8             A     I do not have them.  I was not intending to

9        play them.  Hopefully I won't have to.

10            Q     Don't you think it would be very persuasive to

11       the Court if you could show the Court that I was --

12                  MR. CAPLAN:  Objection, Your Honor.

13                  THE COURT:  Sustained.  Anymore questions of

14            this witness?

15                  MR. DURIE:  No, I'll wait until I testify.

16                  THE COURT:  Anything further?

17                  MR. CAPLAN:  No, Your Honor.

18                  THE COURT:  So you called him after you got

19            some papers, and the one time you actually spoke to

20            him was in response to your call; is that fair to

21            say?

22                  THE WITNESS:  Yeah, I had initiated the first

23            call which I -- was probably not the best decision,

24            but, yes, I called him first.  I mean, what is going

25            on, why am I getting this order?  And then he -- and
```

*Why not incriminate me!*

1	then he contacted me three other times with the

2	voice mails that I have, yes, sir.

3	THE COURT:  So there are three voice mails, not

4	two?

5	THE WITNESS:  There's three voice mails and one

6	conversation.

7	THE COURT:  And when you actually spoke to him,

8	did he talk about what was going on in the

9	Bankruptcy Court or was he trying to collect a debt?

10	THE WITNESS:  He was trying to collect a debt.

11	THE COURT:  What exactly or sort of did he say?

12	THE WITNESS:  Threatened me.  You know, if

13	you're not going to do this, you're not going to pay

14	me, then I'm going to take you to court, I'm going

15	to reopen the case and I'm going to drag you through

16	this and he went on and on and on and on.  I started

17	crying and I hung up.

18	THE COURT:  What was the substance of the

19	recorded messages?

20	THE WITNESS:  The same thing.  Just a another

21	replay of that, and I can get -- I can probably get

22	you the MP3 electronic file.

23	THE COURT:  And the three voice mails, did --

24	THE WITNESS:  I did not do any --

25	THE COURT:  Excuse me, ma'am.

*[handwritten annotation in left margin: She Did not even answer the phone!]*

Asked her what she
would propose in 1st 2
messages & Asked to
take her deposition in   16

THE WITNESS:  I'm sorry.

THE COURT:  The three voice mails, did he talk
about what was pending in this Court or was he
merely trying in your opinion to collect the debt?

THE WITNESS:  Just collect the debt.
Threatened me to pay him money.

THE COURT:  How did he threaten you?

THE WITNESS:  Not threatening me with my life
per se.  Just threatening me that he's going to take
me to court and reopen this case and that I was a
thief and a liar and every creditor is going to know
and just went on and on and on and on and on.  I
mean, it was just, you know, for minutes.

THE COURT:  Okay.

THE WITNESS:  Just scared me.

THE COURT:  Anything further of this witness?

MR. CAPLAN:  Not of this witness.

THE COURT:  You may step down.

                    *   *   *   *   *

# C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF ORANGE

I, CYNTHIA D. VACHON, being a Stenograph Shorthand
Reporter and Notary Public, State of Florida at Large, do
hereby certify that I transcribed the stenograph notes
and reduced to typewriting under my supervision; and that
the foregoing pages numbered 3 through 16, inclusive, are
a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee
or counsel of any of the parties, nor financially
interested in the foregoing action.

WITNESS my hand and seal this 7th day of March,
2008, in the City of Orlando, County of Orange, State of
Florida.

CYNTHIA D. VACHON
Notary Public

CYNTHIA D. VACHON
Notary Public, State of Florida
My comm. expires June 29, 2010
No. DD 559225